IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE FIRST GUARANTY MORTGAGE, CORPORATION, *et al.*, | : : : | Chapter 11 Bankr. No. 22-10584 (CTG) (Jointly Administered) |
| Liquidating Debtors. | : | |

---

| | | |
|---|---|---|
| PACIFIC INVESTMENTS MANAGEMENT COMPANY LLC, *et al.*, | : : : | Civ. No. 24-0001-CFC |
| Appellants, | : : | |
| v. | : : | |
| KARI CRUTCHER, | : : : | |
| Appellee. | : | |

---

Peter H. White, Jeffrey F. Robertson, SCHULTE ROTH & ZABEL LLP, Washington, DC; Kristine Manoukian, SCHULTE ROTH & ZABEL LLP, New York, New York; Robert J. Stearn, Jr., Zachary J. Javorsky, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware

  *Counsel for Appellants*

J. Nelson Thomas, Jonathan W. Ferris, THOMAS & SOLOMON PLLC, Rochester, New York; Stephen B. Brauerman, Ericka F. Johnson, Emily Skaug, BAYARD, P.A., Wilmington, Delaware

  *Counsel for Appellee*

## **MEMORANDUM OPINION**

March 31, 2025
Wilmington, Delaware

*Col F. C*
CHIEF JUDGE

## I.   INTRODUCTION

This dispute arises in the chapter 11 bankruptcy cases of First Guaranty

Mortgage Corporation ("FGMC") and an affiliate (together, the "Debtors"). Pacific

Investment Management Company LLC ("PIMCO") and PIMCO Investments LLC

("PI") (together, the "Appellants" or the "PIMCO Parties"), have appealed the

Bankruptcy Court's December 27, 2023 *Order Denying Motion to Enforce Plan*

*Injunction* (D.I. 1-2; Bankr. D.I. 1088)[1] (the "Order") which held, for the reasons set

forth in the accompanying Opinion, *In re First Guaranty Mortgage Corporation*,

2023 WL 8940688 (Bankr. D. Del. Dec. 27, 2023), that a claim against the

Appellants for "knowingly assisting" the Debtors in the alleged making of a false

statement under 31 U.S.C. § 3729 *et seq*. (the "False Claims Act"), to the extent

such any such claim is recognized by law,[2] was not a derivative or estate cause of

action but rather a direct claim that was not part of the Debtors' bankruptcy estate

---

[1] The docket of the chapter 11 cases, captioned *In re First Guaranty Mortgage Corp. et al.*, No. 22-10584 (CTG), is cited herein as "Bankr. D.I. __."

[2] Appellants vigorously dispute the suggestion that current law recognizes the existence of any such cause of claim. As the Bankruptcy Court correctly noted, and as the parties agreed, "the *merits* of the claim for 'knowing assistance' is not before this Court." *In re First Guaranty Mortgage,* 2023 WL 8940688 at *3. Rather, the Opinion considered only "whether such a claim, if it is in fact recognized by the law, is one that is covered by the release contained in the confirmed plan." *Id.* The Bankruptcy Court's analysis thus assumed "for argument's sake that the claim is a valid one. But to be clear, that is just an assumption, and one whose correctness (or not) is for another court to decide." *Id.*

and thus not released by the Debtors in connection with the Debtors' confirmed

plan. For the reasons set forth herein, I will affirm the Order.

## II.    BACKGROUND

Prior to the chapter 11 cases, FGMC, a Virginia corporation, operated as a

mortgage lender that offered residential home mortgage loans tailored to borrowers'

individual financial situations. Appellee Kari Crutcher ("Relator") alleges that she

was employed by FGMC as a loan underwriter for three months, from September

2014 to November 2014. *See* Relator's proposed Third Amended Complaint (A807-

73) ("TAC") at A817 ¶ 37. Relator filed this *qui tam* action in the Georgia District

Court[3] on October 13, 2016 against FGMC, alleging that FGMC violated the False

Claims Act by endorsing certain mortgages as eligible for the insurance program run

by the United States Department of Housing and Urban Development's ("HUD")

Federal Housing Administration ("FHA"). A808-09 ¶ 2. The United States

declined to intervene. A80-87.

The TAC alleges that HUD granted FGMC the ability to endorse loans for

FHA insurance without any prior review and compensated FGMC for each loan it

approved. A809 ¶ 4. After FGMC originated the mortgage loans that were

---

[3] *United States of America ex rel. et al. v. First Guaranty Mortgage Corp.*, No. 1:16-
cv-3812 (N.D. Ga. Oct. 13, 2016). On November 6, 2023, the action was
transferred to this Court. *United States of America ex rel. et al. v. First Guaranty
Mortgage Corp.*, No. 23-1261-CFC (Nov. 6, 2023).

endorsed for FHA insurance, FGMC typically sold the mortgages to third parties. A807 ¶¶ 10.  If the borrower later defaulted, the subsequent holder of the mortgage would submit a claim to HUD under the FHA mortgage insurance program.  The TAC alleges that FGMC ignored HUD rules and chose to increase its profits by certifying as eligible loans that were ineligible for governmental insurance.  A809-10 ¶¶ 3-5.  The TAC alleges that the scale of this fraud was massive, A812-13 ¶ 16, and that FGMC gained from it the benefit of risky loans while putting the risk on the United States, A808-09 ¶ 2.

PIMCO served as the investment manager to certain private investment vehicles that extended loans to, or acquired equity of, FGMC.[4]  The TAC alleges that "in 2015, PIMCO bought FGMC" using "a series of funds ...namely, B2 FIE IV LLC, B2 FIE Trust, FIE IV Holdco LLC, and PIMCO BRAVO Fund II, L.P. (collectively referred to as "PIMCO Purchasers")" and that "[t]he stated goal in

---

[4] As set forth in its brief, "PIMCO serves as the investment manager or advisor to various investment funds and accounts, which are separate legal entities that pursue their own investment strategies." D.I. 16 at 5.  "Investment advisors ... provide advice or other discretionary services on an ongoing basis, for which they typically charge recurring fees based on a percentage of the assets they manage." *XY Plan. Network LLC v. S.E.C.,* 963 F.3d 244, 248 (2d Cir. 2020).  An investment advisor is a "separate legal entity" from its advisory clients. *Janus Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 138 (2011).  Investments by advisory clients, even at the adviser's recommendation, belong to the clients and not to the investment advisor. *See id.* at 138-40.
    PI is a limited purpose broker-dealer.  In contrast to investment advisors, broker-dealers like PI "effect securities transactions for customers, for which they typically charge a commission or other transaction-based fee." *Id.* at 248.

purchasing and managing FGMC was to originate higher risk loans and more loans with the goal of increasing FGMC's profits." A814 ¶¶ 21-23.  The TAC alleges that, following the September 2015 investments, the PIMCO Purchasers "gained control over FGMC," and "assisted [Appellants] to further increase FGMC's extension of highly risky loans, including loans that did not meet the government's legal requirements for insurance."  A860 ¶¶ 194-195.  The TAC asserts that Appellants engaged in conduct that independently triggered their own liability for "knowingly assisting" in making false claims to the government which amounted to mortgage fraud.  *See* A813-14 ¶¶ 21-23; A860-64 ¶¶ 194-213.

On June 30, 2022, the Debtors filed chapter 11 petitions in the Delaware Bankruptcy Court.  *See* A61-79.  On November 2, 2022 the Bankruptcy Court issued its Confirmation Order (A88-136) confirming the Debtors' chapter 11 plan (A137-244) (the "Plan").  Through the Plan, the Debtors released any claims that they might have held against Appellants.  A227 § 16.2(a) (releasing "any and all claims … , *including any derivative claims, asserted or assertable on behalf of [the Debtors]* … , that [the Debtors] would have been legally entitled to assert in [their] own right, or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof)"); A173 § 3 (defining "Released Party" and "Related Persons" to include the PIMCO Parties).  Thus, the

4

Plan and Confirmation Order enjoined Relator from asserting any derivative or estate causes of action released under the Plan. No party appealed the Confirmation Order, and it is a final order.

On July 29, 2022, one day before the FGMC commenced bankruptcy proceedings (and six years after filing her original *qui tam* complaint), Relator amended her complaint to add Appellants as defendants. A001. In August 2023, Relator filed a motion seeking relief from the Plan injunction to permit her to proceed in the *qui tam* action against FGMC in name only, with any recoveries limited to any insurance that may be available. B.D.I. 897. By order dated September 8, 2023, the Bankruptcy Court granted that motion. B.D.I. 960.

Prior to filing the TAC, which is at issue in this appeal, Relator's Supplemental Second Amended Complaint ("SSAC") became the operative complaint in June 2023. A524-91. The SSAC alleged that the Appellants controlled every aspect of FGMC through personnel decisions (A578-82 ¶¶ 191, 201), operational decisions (*id.*), and daily monitoring and frequent visits (*id.* ¶¶ 189-204), and that through these actions, Appellants "directly caused" FGMC's false statements, caused FGMC to "serve as PIMCO's alter ego," and "should not receive the protections of the corporate veil." *Id.* ¶¶ 205-07.

In August 2023, Appellants filed a motion seeking a determination that Relator's alter ego and veil piercing claims violated the Plan injunction because the

claims set forth in the SSAC were derivative or estate causes of action that had been

released by the Debtors.  Under established Third Circuit precedent, a debtor's

property includes all of its claims that exist when the debtor commences bankruptcy

proceedings.  *See In re Emoral*, 740 F.3d 875, 879 (3d Cir. 2014); *Bd. of Trs, of*

*Teamsters Loc. 86 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 & n.5 (3d

Cir. 2002).  Appellants argued that the alter ego and veil piercing claims set forth in

the SSAC were claims that (if meritorious) the Debtors could have pursued on their

own because they were claims that belonged to the Debtors' estates and existed

when the Debtors commenced their bankruptcy proceedings, and are based on

allegations common to all creditors.  Following a hearing held September 5, 2023

(A595-668), the Bankruptcy Court issued its Order (A592-94) (the "Enforcement

Order"), determining that the SSAC asserted released, derivative claims against

Appellants and holding that:

> Any and all claims, causes of action, liabilities, remedies,
> and/or theories relating to ***alter ego, veil piercing, and/or***
> ***any form of vicarious liability***, including those asserted in
> the [SSAC] against any of the PIMCO Parties
> (collectively, the "Released Claims") were the property of,
> and belonged to, the Debtors' estates" ... [and] "the
> Debtors have conclusively, absolutely, unconditionally,
> irrevocably, and forever released the Released Claims."

A592 ¶¶ 2-3 (emphasis added).  The Enforcement Order further "directed [Relator]

to immediately cease and refrain from any further acts to commence or continue ...

to prosecute ... the Released Claims asserted against [Appellants]." *Id.* ¶ 4.

As of October 5, 2023, a month after the Enforcement Order was entered, Relator had not taken any action to dismiss the claims as required. Accordingly, on that date, Appellants moved to have Relator held in contempt. B.D.I. 988.

On October 13, 2023, Relator filed a motion in the Georgia District Court, seeking leave to amend her complaint. A686-753. Relator contended in the Delaware Bankruptcy Court that the proposed amendment would dismiss the claims for veil piercing. Appellants argued that the proposed amended complaint did not remove claims for conspiracy, which were, in substance, no different from veil piercing claims, and that the proposed amended complaint thus continued to assert claims that belonged to FGMC that were released under the Plan. In further briefing, Relator again moved the goal post, attaching the TAC, a further revised complaint that purportedly removed the claims of conspiracy. The TAC abandoned the SSAC's prior assertions that Appellants "caused" FGMC's violations or "conspired with" FGMC. A861-64 ¶¶ 200, 213. The TAC alleges that Appellants are liable under the False Claims Act "because they knowingly assisted FGMC" in presenting false claims to the government, that Appellants' alleged liability for dominating and controlling FGMC "does not stem from an alter ego claim or veil piercing claim." A859-60 ¶¶ 192, 193, 195.[5]

---

[5] Relator asserts that the False Claims Act "applies to anyone who knowingly assists in causing the government to pay claims grounded in fraud." D.I. 20 at 9 (quoting *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir.

Appellants argued in response that the TAC repeats the same allegations regarding their domination and control over FGMC, that Relator's theory of liability was the same, and that the "knowing assistance" claim remained an estate cause of action that was released under the Plan. Conversely, Relator argued that the "knowing assistance" claim is a claim held not by the Debtors, but held by the United States, which the False Claims Act permits her to assert on the government's behalf as relator. In its thorough Opinion, the Bankruptcy Court agreed with Relator, holding that the claim Relator sought to assert though the TAC is not an estate cause of action and thus falls outside of the scope of the claims released by the Debtors under the Plan. *In re First Guaranty Mortgage*, 2023 WL 8940688, at *1. And the Court thus held that Relator's assertion of the "knowing assistance" claim, if such a claim is recognized by law, "does not violate the plan injunction." *Id.*

On December 29, 2023, Appellants filed a timely notice of appeal. The appeal is fully briefed. D.I. 16, 20, 22. No party requested oral argument.

## III.    JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over this appeal from the Bankruptcy Court under 28 U.S.C. § 158. This Court reviews the Bankruptcy Court's legal

---

2004) and further citing *U.S. ex. Rel. Schmidt v. Zimmer*, 386 F.3d 235, 243-44 (3d Cir. 2004)).

determinations *de novo* and its factual findings for clear error.  *In re Am. Pad &*
*Paper Co.*, 478 F.3d 546, 551 (3d Cir. 2007).

## IV.   ANALYSIS

### A.   Applicable Standard

The issue presented to the Bankruptcy Court was whether the alleged cause of
action against Appellants for "knowingly assisting" the Debtors in the presenting of
a false claim is property of the estate and was therefore released under the Plan.  As
the Third Circuit has explained, a cause of action is considered property of the estate
if the claim existed at the commencement of the bankruptcy filing and the debtor
could have asserted the claim on its own behalf.  *Emoral*, 740 F.3d at 879;
*Foodtown*, 296 F.3d at 169 n.5; *Wilton Armetale*, 968 F.3d at 282.  "The claim must
be a general one, with no particularized injury arising from it."  *Emoral*, 740 F.3d at
879; *Foodtown*, 296 F.3d at 170; *Wilton Armetale*, 968 F.3d at 282.

The Opinion focuses on the second element of the test,[6] "which hinges on
whether the claim is 'general' to the estate or 'personal' to a specific creditor."

---

[6] With respect to the first element of the test (i.e., whether the claim against
Appellants for "knowingly assisting" the Debtors in the presenting of false claims
existed at the commencement of the bankruptcy case), to the extent such a claim is
recognized under law, it existed at the commencement of the chapter 11 cases
because the alleged false claims preceded it.  "In bankruptcy, a 'claim' arises when
an individual is exposed to conduct giving rise to an injury."  *Wilton Armetale*, 968
F.3d at 282 (cleaned up).  As to whether such a claim could have been brought by
the Debtors in the first instance, this seems unlikely as the claim belongs to the

*Wilton Armetale*, 968 F.3d at 282. Individual creditors have the statutory authority to bring only personal claims. *Emoral*, 740 F.3d at 879. "That is because a general claim inures to the benefit of all creditors by enlarging the estate, and so the trustee is the proper person to assert the claim." *Id.* (cleaned up). "The distinction between general and personal claims 'promotes the orderly distribution of assets in bankruptcy' by funneling all asset-recovery litigation through a single plaintiff: the trustee." *Wilton Armetale*, 968 F.3d at 282 (quoting *Emoral*, 740 F.3d at 879).

As the Third Circuit instructs, "[t]o distinguish general from personal claims, we focus not on the nature of the injury, but on the 'theory of liability.'" *Id.* (quoting *Emoral*, 740 F.3d at 879). "Claims alleging that 'third parties ... wrongfully deplete[d] the debtor's assets' are general or derivative because '[e]very creditor has a similar claim for the diversion of assets of the debtor's estate.'" *Id.* (quoting *Tronox Inc. v. KerrMcGee Corp. (In re Tronox Inc.)*, 855 F.3d 84, 103 (2d Cir. 2017)). The theory of recovery for those claims is "not tied to the harm done to the creditor by the debtor." *Tronox*, 855 F.3d at 103. Rather, it is "based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim[s] against the debtor." *Id.* at 104. Thus, "harm done mainly to the debtor can indirectly injure the creditors, making the claim a

---

government and targets Debtors' conduct (and Appellants' alleged knowing assistance in that conduct).

10

general one." *Wilton Armetale*, 968 F.3d at 283. "If the theory of recovery would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors, then the claim is general, not personal." *Id.* (cleaned up). "Only when a particular creditor suffers a direct, particularized injury that can be directly traced to the defendant's conduct is the claim personal to that creditor and not property of the estate." *Id.* (cleaned up).

**B.    The Bankruptcy Court Correctly Held that the Cause of Action Is Not Derivative**

Applying this test, the Bankruptcy Court determined that Relator's cause of action against Appellants for "knowingly assisting" the Debtors in making a false claim, to the extent such a claim is recognized under law, is a direct claim held by the United States, not a general claim belonging to the Debtors' estate, and thus the Plan release and injunction did not bar Relator from pursuing those claims on behalf of the government in the *qui tam* action.

I agree with this conclusion. Focusing on the "theory of liability," as the Third Circuit instructs, the TAC alleges that the Debtors presented a false claim or statement to the government, that Appellants "knowingly assisted," and any recovery is owed to the United States. This is not a claim "alleging that 'third parties ... wrongfully deplete[d] the debtor's assets,'" which would be general or derivative; rather, it is a claim that third parties (Appellants) assisted the Debtors in wrongfully depleting the assets of another entity—the government. *See Wilton*

11

*Armetale*, 968 F.3d at 282. As such a claim, to the extent it is recognized under False Claims Act, belongs only to the government, it cannot be said that "[e]very creditor has a similar claim for the diversion of assets of the debtor's estate." *Id.*

Moreover, recovery here would not "serve to increase the pool of assets available to all creditors"—rather, any recovery for liability inures to the benefit of the government. *See id; see e.g.,* 31 U.S.C. § 3729(a)(1) ("any person who … knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval … is *liable to the United States Government* for a civil penalty of not less than $5,000 and not more than $10,000 … plus three times *the amount of damages which the Government sustains* because of the act of that person). Here, the theory of liability turns on a direct, particularized injury to the government. "The question is whether the basis for holding the third party liable is unique to a particular creditor or applies equally to all creditors." *In re Port Neches Fuels LLC,* 660 B.R. 177, 187 (D. Del. 2024) (quoting *In re TPC Grp.*, 2023 WL 2168045, at \*6 (Bankr. D. Del. Feb. 22, 2023)). And the TAC's alleged basis for holding Appellants liable is unique to a particular creditor—the government.

As the Bankruptcy Court correctly held, "[a] claim for knowingly assisting the making of a false statement to the government this is not one held by all of FGMC's creditors. The party injured by that knowing assistance (again assuming the claim is a valid one) is not the debtor itself. Rather, it is the government, on

12

whose behalf a relator asserts a claim." *In re First Guaranty Mortgage*, 2023 WL
8940688, at *6. I find no error in the Bankruptcy Court's conclusion that Relator's
claim is not derivative.

### C.    The Bankruptcy Court Did Not Misapply the Standard

The parties do not dispute that the Bankruptcy Court identified the correct
legal standard relevant to determining whether the "knowing assistance" claim states
a direct or derivative claim: the analytical framework set forth by the Third Circuit
in *Wilton Armetale*. *In re First Guaranty Mortgage*, 2023 WL 8940688, at *3.
Appellants challenge the Bankruptcy Court's application of that standard to the
claim at issue. Appellants contend that "while the Opinion correctly recognized that
the proposed TAC would assert a 'derivative' claim against the PIMCO Parties, the
Opinion erred by concluding that the claim was not 'derivative' in the 'corporate
law sense.'" D.I. 22 at 2. But consistent with Third Circuit precedent, the
Bankruptcy Court explained:

> Where the theory of liability turns on a general injury to
> the estate, the law calls that claim a "derivative" claim. It
> is "derivative" in the sense that the injury to the creditor
> derives from the fact that the debtor suffered an injury for
> which the debtor itself has a claim to recover. In this
> sense, the term "derivative" is used similarly to how it is
> used in corporate law to describe the circumstances in
> which a shareholder that alleges that the shares it holds in
> a corporation have declined in value on account of the
> officer or director's breach of duty. There, the shareholder
> does not hold a *direct* claim against the corporation's
> officer or director, but instead holds a *derivative* claim

13

that, if it may be asserted by the shareholder, can only be
asserted on a "derivative" basis on behalf of the company.

*In re First Guaranty Mortgage*, 2023 WL 8940688, at *4 (citing *In re TPC Grp.*,

2023 WL 2168045, at *9). The Bankruptcy Court further explained that the Third

Circuit does not intend to label as derivative all claims asserted against third parties

who played some role in the debtor's management. *See id.* And it cogently

explained that confusion can arise because there are two different meanings with

respect to the word "derivative:"

> [M]atters get complicated by the fact that in a different but
> somewhat related context, the law uses the word
> "derivative" in a way that has an entirely different
> meaning. Under the first use of the term "derivative," the
> corporate-law usage described above, a derivative claim is
> one in which a shareholder's (or a creditor's) legal rights
> "derive" from the rights of the debtor. There is also,
> however, a second—broader—use of the term in which a
> claim is "derivative" if a defendant's potential liability
> derives from the debtor's conduct and/or the defendant's
> relationship to the debtor.

*Id.* at *4. Applying this standard, the Bankruptcy Court found that Relator's claim

did not fall within the "corporate law" usage which would be required to find that

the claim was "derivative" under Third Circuit law. The Bankruptcy Court held

that, to the extent Appellants contend that the "knowing assistance" claim is a

derivative one, that is only true in the second, broader sense. *Id.* at *5.

I agree that Appellants have failed to show that the claims advanced in the

TAC are truly derivative claims in the corporate law sense, such that the legal rights

14

"derive" from the rights of the Debtors, and are not merely derivative in the sense that "potential liability derives from the debtor's conduct and/or defendant's relationship to the debtor." *See* D.I. 16 at 29 (noting that the TAC alleges that Appellants "took control," "gained control," "directed the major actions of FGMC," "direct[ed] FGMC," "picked the new CEO," "handpicked the senior executives," "opened a new operations center," "required" FGMC to switch communications systems, "configured every conference room," required FGMC executives to travel to California to meet with PIMCO, "fir[ed]"and "hir[ed] FGMC personnel, and "directed FGMC to hire" specific executives). As the Bankruptcy Court correctly recognized, these were simply assertions that "liability derives from the debtor's conduct and/or the defendant's relationship to the debtor." *In re First Guaranty Mortgage*, 2023 WL 8940688, at *4.

Appellants further argue that the "Opinion confused and failed to distinguish between the *claim* the TAC would assert against [Appellants]—*i.e.*, that Appellants "knowingly assisted" FGMC in connection with its alleged false statements—with the *theory of liability* for that claim—*i.e.*, that the PIMCO Parties disregarded FGMC's corporate separateness and so dominated and controlled FGMC that they should be liable for FGMC's alleged false statements." D.I. 22 at 4. According to Appellants, Relator's theory of Appellants' liability for "knowing assistance" relies on identical allegations of domination and control over FGMC set forth in the

SSAC—the alter ego and veil-piercing claims which are derivative claims belonging

to FGMC—and the few non-material modifications made in the TAC do not change

the fundamental nature of Relator's claims.  D.I. 16 at 15.  "The Third Circuit is

clear," Appellants argue, "that distinguishing derivative claims from direct claims

requires careful analysis of the substance of the claims—that is, the 'theory of

liability'—not the labels and self-serving characterization of the party asserting

them."  *Id.* at 16-17.  As the theory of liability has not changed, Appellants assert,

Relator's claim for knowing assistance remains a derivative claim that belonged

exclusively to FGMC and is barred by the Plan.

This argument ignores several aspects of the analysis set forth above.  I agree

with the Bankruptcy Court that Appellants' argument "does not support the

argument that Relator's claim is 'derivative' in the sense that it is actually FGMC's

claim to pursue."  *In re First Guaranty Mortgage*, 2023 WL 8940688, at *6.  As the

Bankruptcy Court held in dismissing this argument:

> [Appellants'] only response to this line of analysis is to
> argument that the specific factual allegations that [Relator]
> makes in support of her claim are, at bottom, the same
> kinds of allegations one would make if one were asserting
> a claim for veil piercing or alter ego.  That much is true.
> [Relator] alleges that [Appellants] dominated and
> controlled FGMC, effectively causing it to make the false
> statements.  But this is where the teaching of *Wilton
> Armetale* is critical.  Whether a claim is direct or
> derivative is not a function of whether the facts alleged in
> a particular complaint might *also* support a different cause
> of action that would be a derivative claim.  The analysis

16

> depends on the theory of liability, which directs one's
> focus to the elements of the cause of action asserted, rather
> than the facts alleged in a particular complaint.

*Id.* I agree that, based on the theory of liability, a claim for the knowing assistance in the making of a false statement, if such a claim is recognized by law, is one that would be held by the United States (and could be asserted by a relator under the False Claims Act), not by the entity alleged to have made the false statement. "Indeed, to accept [Appellants'] argument would be tantamount to saying that a claim for aiding and abetting the commission of an intentional tort belongs to the tortfeasor rather than the victim." *Id.*

## V.   CONCLUSION

Appellants have failed to demonstrate any error in the Bankruptcy Court's selection or application of the standard for distinguishing derivative claims from direct claims. Accordingly, I will affirm the Order.

The Court will issue a separate Order consistent with this Memorandum Opinion.